## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 29 2016, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: S.L. and J.L. (Minor Children), and

A.D. (Mother)

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

June 29, 2016

Court of Appeals Case No.
82A04-1510-JT-1794

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Trial Court Cause Nos.
82D04-1505-JT-869
82D04-1505-JT-870

**Brown, Judge.**

A.D. ("Mother") appeals the involuntary termination of her parental rights with respect to her children, J.L., and S.L. (the "Children"). Mother raises two issues, which we revise and restate as:

    I.    Whether the trial court abused its discretion in denying Mother's motion to continue the termination fact-finding hearing; and

    II.    Whether the evidence is sufficient to support the termination of Mother's parental rights.

We affirm.

### Facts and Procedural History

Mother and Jo. L. ("Father"), and together with Mother, ("Parents"), are the biological parents of S.L., born January 19, 2008, and J.L. born March 24, 2009.[1] On September 9, 2013, the Indiana Department of Child Services ("DCS") received a report that S.L. received inappropriate discipline; specifically, that he was punished by having to drink cups of vinegar, being strapped to a stroller, and standing in a corner while holding his arms out, among others. On September 11, 2013, the Children were removed from the Parents' care based on S.L.'s report that the family was homeless and had been living in a car. S.L. stated in the report that he slept "in the front seat [of the car] and my mom and brother sleep in the back" and that he did not feel safe in

---

[1] The court also terminated the parental rights of Father, but he is not participating in this appeal. We recite those facts relevant to Mother's appeal.

the home.  On September 17, 2013, the court held a detention hearing and ordered the Children's continued removal.

[3]     On September 18, 2013, DCS filed petitions alleging that J.L. and S.L. were children in need of services ("CHINS"), due to the reports of inappropriate discipline and homelessness.  On October 16, 2013, the court determined that the Children were CHINS, affirmed its previous detention, and authorized the Children's continued removal from Mother.  On November 13, 2013, the court held a dispositional hearing and issued a dispositional order on December 11, 2013, which required Mother to participate in services, including parent aide services, parenting education classes, random drug screens, supervised or monitored visitation, to remain drug and alcohol free, and to sign all releases necessary to monitor compliance.

[4]     On January 29, 2014, DCS filed a verified information for contempt as to Mother after she admitted to noncompliance with the court's orders due to her failure to remain drug and alcohol free.  Mother was sentenced to ninety days in jail, but the court stayed her sentence.  On July 16, 2014, the court suspended Mother's services due to noncompliance.  On July 30, 2014, DCS filed its first set of termination petitions ("First Termination").  At the start of the October 24, 2014 termination fact-finding hearing Mother requested a continuance, to which DCS objected, and the court took Mother's motion under advisement. After DCS presented evidence in its case-in-chief, both DCS and the Court Appointed Special Advocate ("CASA") agreed to Mother's request for a continuance to further engage in services, and the court set the matter for a

hearing on December 29, 2014. At the close of the First Termination hearing, the court ordered Mother to comply with drug screens, to remain drug and alcohol free, to comply with treatment from Southwestern Behavioral, to follow substance abuse treatment with Counseling for Change, to attend parenting classes recommended by the State, and to work with a parent aide. On January 23, 2015, the First Termination petitions were dismissed, and Mother was again ordered to complete services.

[5] On May 19, 2015, DCS filed its second set of termination petitions ("Second Termination"), and, on August 6, 2015, the court held a fact-finding hearing on the Second Termination. At the start of the Second Termination hearing, Mother requested a continuance, which the court denied, and proceeded with the hearing. The court heard testimony from Mother, Martha Reising, a parent aide at Ireland Home Based Services, family case manager Jennifer Beadles ("FCM Beadles"), James Akin, the clinical director at Counseling for Change, CASA Nancy Ubelhor ("CASA Ubelhor"), family case manager Elizabeth Jost ("FCM Jost"), and J.V., Mother's fiancé.

[6] On October 7, 2015, the court issued orders terminating Mother's parental rights with respect to the Children. Both orders contained detailed findings of fact and concluded that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied, that continuation of the parent-child relationship poses a threat to the Children's well-being, that termination of Mother's

parental rights is in the Children's best interests, and that adoption is a satisfactory plan for the Children.

## Discussion

### I.

The first issue is whether the court abused its discretion by denying Mother's motion to continue the termination hearing. Mother argues that she showed good cause for a continuance and was prejudiced by the court's denial of her motion. In support of her argument, Mother relies on *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*. DCS states that Mother's circumstances are distinguishable from those presented in *Rowlett*, that Mother failed to show good cause or prejudice, and that her desire to explore post-adoption contact is not an issue in termination proceedings.

Indiana Trial Rule 53.5 provides:

> Upon motion, trial may be postponed or continued in the discretion of the court, and shall be allowed upon a showing of good cause established by affidavit or other evidence. The court may award such costs as will reimburse the other parties for their actual expenses incurred from the delay. A motion to postpone the trial on account of the absence of evidence can be made only upon affidavit, showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it. . . .

We note that the decision to grant or deny a motion to continue rests within the sound discretion of the trial court. *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. Discretion is a privilege afforded a trial court to act in accord with what is fair and equitable in each circumstance. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 43 (Ind. Ct. App. 2004), *trans. denied*. A decision on a motion for continuance will be reversed only upon a showing of an abuse of discretion and prejudice resulting from such an abuse. *Id.*

[9] In *Rowlett*, the father, who was incarcerated, had expressed a desire for reunification starting on the very day his children were removed, and was active in the CHINS case. 841 N.E.2d at 618-619. The father requested a continuance of the termination hearing until after his release, which was denied by the trial court. *Id.* at 618. This Court concluded that the trial court abused its discretion in denying the request for a continuance and noted that father had been incarcerated for all but two months of the action and had not been given a full opportunity "to participate in services offered by the OFC directed at reunifying him with his children upon his release from prison." *Id.* at 619.

[10] Unlike the incarcerated father in *Rowlett*, who lacked an opportunity to participate in services and took substantial advantage of the resources available to him while he was incarcerated, Mother was not incarcerated and has been offered a wide range of services over the course of the nearly two-year period of her Children's underlying CHINS cases to improve her fitness to parent the Children, and had not completed the goals of her case plan. Mother was

previously granted a continuance following the First Termination hearing to further engage in services and work towards reunification. After she was given another opportunity to participate in services, at the time of the second hearing she had not completed her second attempt at drug treatment, continued to test positive for drugs, failed to appear for drug screens and was unable to secure stable housing of her own or obtain stable income. Based upon the record and in light of the fact that Mother had been previously given a second opportunity to participate in services, we cannot say that she has shown good cause for another continuance. Therefore, the court did not abuse its discretion in denying her motion.[2]

## II.

[11]     The next issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

---

[2] Mother also relies upon *In re A.J.*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008), *trans. denied*. In *A.J.*, we observed, with respect to a mother who was in the midst of an intensive substance abuse program when the termination hearing was held, that "perhaps the more prudent course would have been to continue the case . . . in order to establish whether [the mother], in fact, completed the . . . program and remained drug free." However, *A.J.* did not involve a motion for a continuance and, despite the observation related to the mother's progress in a substance abuse program, we ultimately affirmed the termination of the mother's parental rights.

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[12] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the

evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[13] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*)). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[14] Here, Mother does not challenge the court's conclusions or develop an argument regarding Ind. Code § 31-35-2-4(b)(2)(A) and -4(b)(2)(C)-(D). We therefore confine our discussion to Section 4(b)(2)(B).

## *Remedy of Conditions*

[15] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[16] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[17]     In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[18]     Mother argues that DCS failed to prove by clear and convincing evidence that she had not remedied the conditions leading to the Children's removal and

points out that at the time of the Second Termination fact-finding hearing she was living in the home of her fiancé's mother and was looking for alternative housing, participating in substance abuse treatment, seeing a therapist at Southwestern Behavioral, and had completed a parenting class.

[19] DCS maintains that Mother does not challenge the court's findings, that the unchallenged findings support the court's decision, and that her arguments are a request to reweigh the evidence. It further points out that Mother failed to remedy the conditions that led to removal, specifically her unstable housing and financial situation and her failure to complete required services.

[20] The trial court's orders addressed Mother's participation in services, therapy, and her search for stable housing. Specifically, the court entered substantially similar separate orders with respect to S.L. and J.L and in the order related to S.L. found:

> **FINDINGS OF FACT**
>
> * * * * *
>
> 12. After the dismissal of the termination petition, [Mother] once again failed to follow through with services. The State again filed for termination.
>
> 13. On August 6, 2015, the termination hearing took place. [Mother] was represented by an attorney. [Mother] acted appropriately throughout the proceedings, but on many occasion[s] the Court found her testimony to be less than forthcoming.

14. Throughout the course of the CHINS case, [S.L.] was never returned to her care, thus [S.L.] has been separated from [Mother] for almost two years. The main obstacle to returning [S.L.] was lack of consistency on [Mother's] part. The primary issue in the case was one of stable housing, but as the case progressed it was apparent that substance abuse and mental health issues also existed, which could adversely affect the housing issue long term.

15. The Department offered [Mother] several resources to help her secure housing in the CHINS case. In 2014, [Mother] was offered housing at Albion, a local agency specializing in domestic violence counselling. [Mother] only stayed at Albion for two weeks. After leaving Albion, [Mother] was offered long term housing at the YWCA. [Mother] only stayed at the YWCA for two weeks. Next [Mother] was offered [] long term housing at Goodwill. [Mother] did not take advantage of this housing option, instead [Mother] turned it down. Mother also stated that in two years, she only visited the section 8 office once, which could have supplied her the necessary housing to get her child back. [Mother] indicated that they were not accepting applications the one time she asked, so she never returned.

16. From September 2013 to 2015, [Mother] moved at least 6 times and at no point was [S.L.] able to be reunified into her care. At one of her homes she had a noose hanging in the living room, which was later removed after being observed by CASA. The displaying of a noose causes concern to the Court as [Mother] also wore a black skull and crossbones t-shirt for the trial with black fingernail polish. The Court will not speculate as to why [Mother] chooses to hang a noose in her home, but clearly [S.L.] should not be around such decor. Most recently, [Mother] has been living with her fiancé and his mother, but the home has never been approved to have [S.L.] there. [Mother] is not on the lease and [Mother] told the case manager she could not come into the home. [Mother] recently has had a few new

plans to secure housing, but at [the] time of the trial this still had not been accomplished.

17. Mother was twice offered a parent aid that could help her find good and stable housing and employment, but [Mother] stop[ped] working with the parent aid[e]. [Mother] claimed this was the parent aid[e']s fault and due to her phone being stolen. The Court did not find [Mother's] testimony credible on her excuses.

18. Mother claims she cannot work as she is under too much stress and she is hoping for disability, but there is no indication that she will receive disability in the near future. [Mother] rel[ies] on her fiancé, who she has had an on-off relationship in the past, for financial support. He works hard and brings home approximately $400 a week.

19. Mother has failed to complete her substance abuse [sic]. Mother admits to testing positive for drugs not prescribed to her during the case. After being ordered to comply with services in January of 2015, [Mother] tested positive for prescription pills and failed to appear for several drug screens. In total, she has missed approximately 20 drug screens and of the approximate[ly] 20 she has taken she has tested positive 6-7 times. Mother reports she is a Xanax abuser, but she has been diagnosed as an opiate abuser.[3] She is actively engaged in treatment, but has not been fully compliant as she has missed 4 sessions, which normally, but not for her, results in termination from the program. She also has not been compliant in submitting proof and/or attending AA meetings as required by the treatment agency. [Mother] has completed 13 treatment sessions, but has

---

[3] James Akin, the clinical director at Counseling for Change, testified that Mother "admitted to some illegal xan[a]x use" and was diagnosed with "opioid use disorder. . . ." Transcript at 305.

at least 19 more to attend. The likelihood that she successfully completes treatment is slim. The likelihood that she relapses is great.

20. Mother originally started substance abuse treatment for free in November of 2014. However, in February of 2015, [Mother] was discharged for failing to attend. After the Department filed its second termination petition, [Mother] re-enrolled for free treatment at Counseling for Change to address her substance abuse. This is the treatment she is now undergoing. She is also receiving some support for her emotional state, but it is unclear whether this service is truly mental health treatment as the Court had previously ordered. The Court had ordered a psychological assessment and treatment at Southwestern Behavioral, the local mental health agency, which specializes in mental health care, including the possibility of prescribing medication. [Counseling] For Change does not offer such services. [Mother] failed to follow up with the local mental health agency.

21. [Mother], to her credit, completed a parenting class as ordered by the Court.

22. [Mother] also regular[ly] attends visits with [S.L.].

23. Unfortunately, [Mother] now admits she has a gambling problem and spends approximately $25 a week on lottery tickets. This particular issue had never been addressed at a Court hearing or the DCS.

24. The Court also offered [Mother] information on the Aids Resource Group. The Aids group would be free to [Mother], yet [Mother] never took advantage of this service.

25.  The CASA, who had been a part of the case since January of 2014, testified that placement of [S.L.] with [Mother], was not in [S.L.'s] best interest.

26.  The DCS family case manager Jennifer Bea[d]les encouraged [Mother] to complete services to the extent that when [S.L.] changed placements, the family case manager purposely placed [S.L.] in a non-"pre-adoptive" home to encourage [Mother] to work [sic] her services and be reunified with [S.L.].  Mother did not work [sic] her services.

27.  Current family case manager Elizabeth Jost has tried to meet with the [Mother].  She has tried to help [Mother] engage in services. Due to [Mother's] short [sic] comings coupled with the needs of [S.L.], the current family case manager recommends that [Mother's] termination of parental rights because it would be in [S.L.'s] best interest.  Further the family case manager testified that the permanency plan should be adoption.

28.  [S.L.] is adoptable.

29.  The plan of adoption is a satisfactory plan to achieve permanency for [S.L.].

Appellant's Appendix at 23-26.

[21]  To the extent Mother does not challenge the juvenile court's findings of fact, these unchallenged facts stand as proven.  *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, the court accepted them as true).

[22] The record reveals that the Children were initially removed from Mother's care, in part, due to her inability to maintain stable housing and inappropriate discipline. At the time of the hearing, Mother had not obtained stable housing and had not completed all of her required services. Mother has moved six times since September 2013, and has resided in a motel and at various shelters. She was living in her fiancé's mother's home at the time of the hearing. Mother further acknowledged that the Children could not live in her current residence because DCS had not assessed its suitability. As to housing, the court found that Mother was not "on the lease" for the apartment, at one point "told the case manager she could not come into the home," and although she stated that she "had a few new plans to secure housing, [] at [the] time of the trial this still had not been accomplished." Appellant's Appendix at 24. Regarding Mother's finances, the record reveals, and the court's findings reflect that at the time of the hearing, Mother was unemployed, was unsuccessful in her efforts to obtain disability, and was dependent on her fiancé for income. Also, after Mother was given a second chance to participate in services, she completed only thirteen drug treatment sessions and had at least nineteen more sessions before the program would be completed, accumulated four unexcused absences, and failed to document her attendance at mandatory AA meetings. Mother also produced a positive drug screen in April 2015 for hydrocodone and hyrdomorphone, and had not maintained consistent contact with her parent aide. When reviewing Mother's participation in services, FCM Jost testified that Mother had completed a parenting class and complied with visitation but that she had failed to complete substance abuse treatment and remain drug and alcohol free, failed

to complete individual counseling, and had not complied with her parent aide's requirements. CASA Ubelhor stated that her recommendation is "to terminate parental rights and get these kids adopted," adding that she did not "believe the mother is capable of mothering or parenting the children" and that Mother had not "shown us by compliance [with the case plan] that she's interested in parenting them." Transcript at 330.

[23] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to the Children's removal would not be remedied.

*Conclusion*

[24] We conclude that the trial court's judgment terminating Mother's parental rights is supported by clear and convincing evidence. We find no error and affirm.

[25] Affirmed.

Baker, J., and May, J., concur.